No. 26-1852

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

UNITED STATES,

Plaintiff-Appellant,

v.

THE CITY OF BOSTON; MICHELLE WU, *Mayor of The City of Boston, in the official capacity*; MICHAEL A. COX, *Police Commissioner, in the official capacity*; BOSTON POLICE DEPARTMENT,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Massachusetts

**BRIEF FOR APPELLANT UNITED STATES**

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

LEAH B. FOLEY
*United States Attorney*

DANIEL TENNY
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4214*

## TABLE OF CONTENTS

**Page**

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 3

STATEMENT OF THE ISSUE ........ 4

STATEMENT OF THE CASE ........ 4

I. Legal and Regulatory Background ........ 4

II. Challenged Provisions of City Ordinance ........ 9

III. Prior Proceedings ........ 12

SUMMARY OF ARGUMENT ........ 17

STANDARD OF REVIEW ........ 18

ARGUMENT ........ 19

THE FEDERAL GOVERNMENT HAS STANDING TO CHALLENGE THE BOSTON TRUST ACT ........ 19

A. The Boston Trust Act Harms the United States By Impeding Cooperation ........ 19

B. The Massachusetts Supreme Judicial Court's Decision in *Lunn* Does Not Negate Standing ........ 23

C. The District Court Erred in Resolving the Government's Express Preemption Argument on the Merits ........ 26

CONCLUSION ........ 38

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Constitution** **Page(s)**

U.S. Const. art. I, § 8, cl. 4 .......... 4

**Federal Cases**

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 4, 5, 6, 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 20

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) .......... 9

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 17, 22, 23

*Hinck v. United States*,
550 U.S. 501 (2007) .......... 37

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .......... 29

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) .......... 31

*League of United Latin Am. Citizens v. Executive. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) .......... 16

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 20

*New York v. U.S. Dep't of Just.*,
951 F.3d 84 (2d Cir. 2020) .......... 9

*Nielsen v. Preap*,
586 U.S. 392 (2019) .......... 5

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .......... 37

*Rudisill v. McDonough*,
601 U.S. 294 (2024) ........................................................................ 31

*Shomberg v. United States*,
348 U.S. 540 (1955) ........................................................................ 36

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........................................................................ 19

*Stone v. INS*,
514 U.S. 386 (1995) ........................................................................ 24

*United States v. Arlington Cnty.*,
669 F.2d 925 (4th Cir. 1982) .......................................................... 21

*United States v. Colorado Supreme Ct.*,
87 F.3d 1161 (10th Cir. 1996) ........................................................ 21

*United States v. County of Washtenaw*,
No. 26-11166, 2026 WL 2453724 (E.D. Mich. Aug. 21, 2026) ..... 21-22

*United States v. Illinois*,
796 F. Supp. 3d 494 (N.D. Ill. 2025) ........................................... 1, 21

*United States v. Minnesota*,
No. 25-cv-3798, 2026 WL 2085701 (D. Minn. July 20, 2026) .... 1-2, 21

*United States v. Missouri*,
114 F.4th 980 (8th Cir. 2024) ................................................ 1, 17, 21

*United States v. New Jersey*,
No. 26-1770, 2026 WL 2621025 (D.N.J. Sep. 4, 2026) ...................... 22

*United States v. Texas*,
599 U.S. 670 (2023) .......................................................................... 5

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000) ........................................................................ 21

*Warth v. Seldin*,
422 U.S. 490 (1975) .................................................................. 18, 26

*Wiener v. MIB Grp., Inc.*,
86 F.4th 76 (1st Cir. 2023) .......... 18, 19

*Xia v. Bondi*,
137 F.4th 85 (2d Cir. 2025) .......... 31

**Federal Statutes**

6 U.S.C. § 251 .......... 5
8 U.S.C. § 1101 .......... 4
8 U.S.C. § 1182 .......... 27, 34
8 U.S.C. § 1226 .......... 5, 6, 7, 8, 27
8 U.S.C. § 1229 .......... 5
8 U.S.C. § 1229a .......... 5
8 U.S.C. § 1231 .......... 6, 7, 27, 28, 33, 34
8 U.S.C. § 1255 .......... 30
8 U.S.C. § 1306 .......... 34
8 U.S.C. § 1357 .......... 7, 30
8 U.S.C. § 1373 .......... 3, 8, 9, 11, 14, 16, 18, 28-37
8 U.S.C. § 1644 .......... 3, 9, 11, 14, 30, 32, 35
28 U.S.C. § 1291 .......... 4
28 U.S.C. § 1331 .......... 3
28 U.S.C. § 1335 .......... 3
Immigration and Nationality Act of 1952,
Pub. L. No. 82-414, 66 Stat. 163 .......... 36

**Federal Regulations**

8 C.F.R. § 245.1 .......... 34
8 C.F.R. § 287.7 .......... 7

**State Case**

*Lunn v. Commonwealth*,
78 N.E.3d 1143 (Mass. 2017) .......... 2, 15, 17, 23, 24, 25

**Local Ordinance**

Bos., Mass., Mun. Code ch. 11, § 1.9 ..........1, 10, 11, 15, 19, 20, 27, 33-35

**Other Authorities**

H.R. Rep. No. 104-725 (1996).................................................................32

S. Rep. No. 104-249 (1996) ................................................................. 32

U.S. ICE, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers* (Mar. 24, 2017).....................................................6

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The district court dismissed the federal government's complaint, holding that it lacks standing to challenge the Boston Trust Act, a local ordinance that interferes with federal officers' ability to enforce federal immigration law. The government respectfully requests that the Court hold oral argument. Argument will aid the Court in resolving the important issues presented by this appeal.

## INTRODUCTION

In 2014, the City of Boston (Boston) enacted the Boston Trust Act, a local ordinance that bars virtually all cooperation with federal immigration authorities. *See* A62-67 (copy of Act as amended in 2019); Bos., Mass., Mun. Code ch. 11, § 1.9. As particularly relevant here, when persons subject to immigration detention or removal are in local custodies, local officers are prohibited from taking a range of measures that would facilitate an orderly transfer of custody. Indeed, local officials cannot even communicate basic information to immigration officers unless served with a judicial warrant or order. Without any cooperation from local authorities, federal immigration officers are hampered in their ability to enforce federal immigration law in Boston.

Faced with that concrete harm, it is well established that the federal government can sue to vindicate its "legally protected interest in enforcing federal law." *E.g.*, *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024). Indeed, a host of district courts have applied that rule to State and local laws materially indistinguishable from the Boston Trust Act. *See, e.g.*, *United States v. Illinois*, 796 F. Supp. 3d 494, 509 (N.D. Ill. 2025); *United States v. Minnesota*, No. 25-cv-3798, 2026 WL

2085701, at *9 (D. Minn. July 20, 2026). Nevertheless, the district court here dismissed the federal government's complaint for lack of standing. *See* A1. In doing so, the court committed two errors.

First, the district court placed too much weight on the Massachusetts Supreme Judicial Court's decision in *Lunn v. Commonwealth*, 78 N.E.3d 1143 (Mass. 2017). In *Lunn*, the court held that Massachusetts law does not authorize state officers to retain custody over (and thereby arrest) an individual based only on a civil immigration detainer. Thus, according to the district court, *Lunn* prevents any meaningful change to the status quo: with or without the Boston Trust Act, local officials cannot hold prisoners pursuant to an immigration detainer. But even assuming *Lunn* states a valid rule of law, it would not deprive the federal government of standing. The Boston Trust Act prohibits conduct far beyond the detentions at issue in *Lunn*. And that is a concrete harm for which the government can seek redress.

Second, the district court erred in rejecting the federal government's express preemption argument on the merits—purporting to do so under the guise of standing. Even apart from the fact that the court mistakenly treated its merits disposition of the federal

government's claims as if they precluded standing, that merits ruling was wrong. Federal law prohibits Boston from restricting its officers' ability to share "information *regarding* the citizenship or immigration status" of an individual. 8 U.S.C. § 1373(a) (emphasis added); *see also id.* § 1644. For this language to have any meaning, it must reach information beyond an individual's legal classification under the federal immigration laws—*i.e.*, his "citizenship or immigration status." At minimum, this must include facts that bear on an individual's citizenship or immigration status—most centrally in this case, information that determines whether an individual is subject to immediate removal from the United States or whether such removal is prohibited by federal law. Thus, the Boston Trust Act runs headlong into § 1373 and must yield under the Supremacy Clause.

## STATEMENT OF JURISDICTION

The United States invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1345. A44. The district court dismissed the federal government's complaint for lack of standing and entered judgment on May 28, 2026. A1, A26. The United States filed a timely notice of appeal

on July 23, 2026. A185; *see* Fed. R. App. P. 4(a)(1)(B) (60-day deadline). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court erred in holding the United States lacks standing to challenge the Boston Trust Act, a local ordinance that prohibits local officers from cooperating with federal officers in the enforcement of federal immigration law.

## STATEMENT OF THE CASE

### I. Legal and Regulatory Background

The Constitution grants the federal government the exclusive authority to establish a "uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. Based on that authority and others, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Through the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* (INA), and related statutes, Congress has created an "extensive and complex" framework for the "governance of immigration and alien status," *Arizona*, 567 U.S. at 395. Two aspects of that framework are particularly relevant here.

**1.** "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. Removal is a civil process initiated at the discretion of federal immigration officers. *Id.*; *see* 8 U.S.C. §§ 1229, 1229a. The U.S. Department of Homeland Security (DHS)—mainly through its component agency, U.S. Immigration and Customs Enforcement (ICE)—is responsible for arresting and detaining aliens who are, or may be, subject to removal.

When federal officials decide to seek removal of an alien, the Secretary of DHS (Secretary) generally has discretion to detain the alien pending resolution of his removability or to release the alien on bond or parole. 8 U.S.C. § 1226(a).[1] But for certain categories of aliens, such as aliens who have committed specified crimes, the Secretary "shall" detain the alien, *id.* § 1226(c)(1), subject to resource constraints and traditional exercises of prosecutorial discretion, *see United States v. Texas*, 599 U.S. 670, 680 (2023). Similarly, once an alien has been adjudged removable, he generally must be removed within 90 days, and he is subject to

[1] Congress has transferred enforcement of certain INA provisions from the Attorney General to the Secretary. *See* 6 U.S.C. § 251(2); *Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019).

mandatory detention—either "[d]uring the removal period" or, in certain circumstances, beyond that period. 8 U.S.C. § 1231(a)(2)(A), (6).

Congress has also specified the procedures for "arrest[ing] an alien during the removal process" to effectuate detention. *Arizona*, 567 U.S. at 407. The INA provides that "an alien may be arrested and detained" pending a removal proceeding based on "a warrant issued by the [Secretary]." 8 U.S.C. § 1226(a). The statute thus authorizes federal immigration agents to rely on administrative warrants, which are issued by the Executive Branch rather than a judicial officer. *Id.* To obtain such an administrative warrant, an ICE immigration agent "must establish probable cause to believe that the subject is an alien who is removable from the United States." U.S. ICE, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers* § 2.4 (Mar. 24, 2017), https://perma.cc/D8QE-RTWM.

**2.** "Consultation between federal and state officials" is another "important feature" of Congress's immigration framework. *Arizona*, 567 U.S. at 411. This expectation of federal-state collaboration is reflected in provisions governing the relationship between federal immigration enforcement and state criminal proceedings. The INA provides that DHS

must take an alien who is "convicted of" certain crimes into custody but only "when the alien is released." 8 U.S.C. § 1226(c)(1); *see also id.* § 1357(d) (authorizing immigration officials to take custody of an alien who violated "any law relating to controlled substances" if the "alien is not otherwise detained by . . . State[] or local officials"). And an alien generally cannot be removed "until the alien is released" from state or local custody. *Id.* § 1231(a)(4)(A). Indeed, an alien with a final order of removal cannot even be detained before his release from state custody. DHS "shall detain" an alien with an order of removal "[d]uring the removal period," but for an alien who "is detained or confined" by state authorities, that period starts only when "the alien is released." *Id.* § 1231(a)(1)(B)(iii), (2)(A).

To bridge the gap between the end of custody by state or local officials and the beginning of federal custody, DHS officials may issue an immigration "detainer" requesting that a state or local agency advise DHS prior to an alien's release so that DHS can arrange to assume custody for the purpose of arresting and removing the alien. *See* 8 U.S.C. § 1226(c)(3); *see also* 8 C.F.R. § 287.7(a). In certain circumstances, such as when an alien has committed a listed crime and is inadmissible on

certain grounds, DHS "shall issue a detainer," and when the alien is no longer "detained by . . . State[] or local officials, shall effectively and expeditiously take custody of the alien." 8 U.S.C. § 1226(c)(3).

Besides these provisions allowing an alien to complete state criminal custody before removal, several other INA provisions likewise reflect Congress's understanding that information sharing between state and federal officials is critical to ensure that federal immigration authorities can fulfill their duties under the INA. For example, the federal government must make resources available to state and local authorities to help them determine whether individuals they have arrested for aggravated felonies are aliens. 8 U.S.C. § 1226(d)(1)(A). The INA also directs the federal government to designate liaisons with "State[] and local law enforcement and correctional agencies . . . with respect to the arrest, conviction, and release of any alien charged with an aggravated felony." *Id.* § 1226(d)(1)(B). And if state or local officials "seek[] to verify or ascertain the citizenship or immigration status of any individual," the federal government must share the requested information. *Id.* § 1373(c).

At the same time, the INA ensures that state and local officials cannot block federal officials from receiving information pertinent to their immigration duties. Section 1373(a) provides that federal, state, and local government entities and officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* §§ 1373(b), 1644 (similar provisions). These provisions help ensure that States and localities do not "frustrate effectuation" of federal immigration law. *See City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (rejecting claim that § 1373 commandeers state and local governments in violation of Tenth Amendment); *see also New York v. U.S. Dep't of Just.*, 951 F.3d 84, 112-14 (2d Cir. 2020).

## II. Challenged Provisions of City Ordinance

In 2014, Boston enacted the Boston Trust Act to "ensure that all immigrants are able to fully participate in the civic and economic life of their neighborhoods and nurture and grow the spirit of unity in [the] City." *See* A59. That Act, as amended in 2019, generally prohibits city

law-enforcement officers from cooperating with civil immigration enforcement. *See* A62-67; Bos., Mass., Mun. Code ch. 11, § 1.9.

Most relevant here are restrictions designed to prevent local officers from cooperating with federal efforts to assume custody after the conclusion of a criminal sentence. Most directly, the Boston Trust Act creates a ban on immigration detainers and administrative warrants. City law-enforcement officers "shall not detain an individual solely on the basis of a civil immigration detainer request or an ICE administrative warrant after the individual is eligible for release from custody." A65; Bos., Mass., Mun. Code ch. 11, § 1.9(B). Nor can they make "arrests based solely on ICE administrative warrants." A66; Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a)(5). But local officials may comply with criminal warrants. *See* A65-66; Bos., Mass., Mun. Code ch. 11, § 1.9(B). Additionally, the Boston Trust Act creates an explicit ban on transfers. City officers are prohibited from "[t]ransfer[ring] an individual to immigration authorities unless authorized by a judicial warrant or other judicial order." A66; Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(b). Finally, the Boston Trust Act imposes a "non-communication provision" to restrict the sharing of information with federal immigration

authorities. City officers cannot share an individual's "personal information" or his "release date or time" with specified federal immigration authorities—absent limited exceptions. A66-67; Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a)(3)-(4), (D)(2). The statute defines "personal information" to include "any information that is maintained by an agency that identifies or describes an individual, that can be used, either alone or in combination with other information, to identify individual subjects, such as his or her name, social security number, physical description, home address, and/or work address." A64; Bos., Mass., Mun. Code ch. 11, § 1.9(A). The limitation on disclosure of "release date and time" has the evident purpose and effect of preventing DHS officials from knowing when a criminal alien will be released and thus making it more difficult to assume custody.

The Boston Trust Act includes a savings clause, stating that the statute "does not prohibit or restrict any government agency from complying with Sections 1373 and 1644 of Title 8 of the United States Code." A67; Bos., Mass., Mun. Code ch. 11, § 1.9(D)(3).

### III. Prior Proceedings

**1.** In September 2025, the United States sued Boston and its Mayor, Police Department, and Police Commissioner, seeking to enjoin aspects of the Boston Trust Act. A56-57.[2]

As the complaint explained, cities "cannot obstruct the Federal Government from enforcing immigration laws," and defendants are "doing [exactly] that" through the Boston Trust Act. A42. The Boston Trust Act, the complaint alleges, "directs Boston law enforcement officers" to "withhold basic information" from federal authorities and to "deny federal officers access" needed "to effect [the] safe transfer" of aliens into federal custody. A42-43. As a result, the Boston Trust Act has "the effect of making it more difficult for . . . federal immigration officers[]" to "carry out their responsibilities" in Boston. A43. For example, federal officers can no longer utilize civil immigration warrants or detainers in Boston, nor can those officials expect other cooperation from Boston authorities—whether that be in the form of information

[2] The district court dismissed the claims against the Mayor, Police Department, and Police Commissioner for lack of standing, *see* A11-12, but the federal government does not challenge that conclusion here because complete relief is available from the City of Boston.

sharing or arranging the orderly transfer of criminal aliens. In the end, the Boston Trust Act upsets the "basic principles of cooperation and comity" that Congress codified in the INA. A47; *see also* A52 (alleging that, "in comity to States," federal law allows States to prosecute criminal aliens before removal).

The complaint goes on to explain how those impacts are especially acute given Boston's history of cooperation with federal immigration authorities. Federal immigration authorities "perform[] a significant portion of [their] law enforcement activities in" Boston, A48, and until recently, Boston had been a "cooperative partner" in those efforts, A51. But as alleged in the complaint, Boston ceased that cooperation following the Boston Trust Act. A51. For example, in 2024, Boston refused to comply with 15 civil immigration detainers. A87. And Boston has refused to provide immigration authorities with access to city facilities, preventing "safe custodial transfer" of aliens. A52. Thus, when operating in Boston, federal officials are forced to engage in "difficult and dangerous efforts to re-arrest aliens" in the community. A54.

Against this backdrop, the complaint pleaded three claims. First, the federal government argued that federal law preempts the Boston

Trust Act. A54-55. This claim involved both express-preemption and conflict-preemption arguments. Specifically, the federal government argued that two statutes—8 U.S.C. §§ 1373(a) and 1644—expressly prevent Boston from enacting the non-communication provision. A55. Separately, the federal government argued the Boston Trust Act (as a whole) operates as an obstacle to the federal government's ability to enforce its immigration laws. A54-55. That is, the Boston Trust Act upsets the cooperative scheme that Congress envisioned.

In the second and third claims, the federal government argued that the Boston Trust Act violates principles of intergovernmental immunity. In one claim, the federal government argued that Act discriminates against the federal government by applying to federal immigration enforcement but not to other forms of law enforcement. A55. In the other, the federal government argued that the non-detainer provision directly regulates federal officials, preventing their ability to use civil immigration detainers. A56.

**2.** Defendants moved to dismiss the complaint for failure to state a claim. After that motion was fully briefed, but before oral argument, the district court requested supplemental briefing on standing. It directed

the parties to address the federal government's standing for "each claim and form of relief sought against the City of Boston." A38 (Text Order). And the court flagged two considerations for that briefing—the Massachusetts Supreme Judicial Court's decision in *Lunn v. Commonwealth*, 78 N.E.3d 1143 (Mass. 2017), and the Boston Trust Act's savings clause, *see* A67; Bos., Mass., Mun. Code ch. 11, § 1.9(D)(3). After argument, the court dismissed the federal government's complaint for lack of standing. A1.

First, the district court addressed the Boston Trust Act's prohibition on compliance with immigration detainers and administrative warrants. A13-21. It held, at bottom, that the federal government suffers no redressable injury based on local officials' refusal to comply with those detainers and warrants. *See* A14. According to the court, Massachusetts state law prohibits such compliance—"[w]ith or without the Boston Trust Act." A14 (citing *Lunn*, 78 N.E.3d at 1160). So according to the court, an order enjoining the Boston Trust Act "could not alter [the] status quo," and the federal government had "not plausibly shown redressability." A14. It is true that redress "need not be complete," the court reasoned, but it must "at least lessen [the

government's] injury." A15 (quotation marks omitted). And the court concluded that enjoining the Boston Trust Act would have no impact on federal officers' ability to enforce federal detainers. *See* A16-17.

Second, the district court addressed the Boston Trust Act's non-communication provision. A21. Again, the court rejected the federal government's standing on traceability and redressability grounds. A21. According to the court, there is "a fatal disconnect between the injury the [federal government] alleges and the judicial relief it seeks." A23. To reach this conclusion, the court relied primarily on the Boston Trust Act's savings clause, which purports to allow compliance with 8 U.S.C. § 1373—the federal statute that bars any restriction on sharing "citizenship or immigration status" information with federal immigration authorities. A23 (quotation marks omitted). That savings clause, the court reasoned, ensures the Boston Trust Act is facially compatible with federal law. A23. Moreover, in a footnote, the court rejected any argument that "the law would 'destroy itself' through its savings clause." A23 n.17 (quoting *League of United Latin Am. Citizens v. Executive. Off. of the President*, 780 F. Supp. 3d 135, 175 (D.D.C. 2025)). And in a

similarly brief footnote, the court rejected the federal government's express-preemption arguments on the merits. A23 n.18.

## SUMMARY OF ARGUMENT

The federal government has standing, and the district court was wrong to conclude otherwise. The Boston Trust Act makes it more difficult for federal officers to enforce federal immigration laws in Boston, and that is a classic injury-in-fact sufficient to support standing. *See, e.g.*, *United States v. Missouri*, 114 F.4th 980, 984-85 (8th Cir. 2024). What is more, those harms are unquestionably traceable to the Boston Trust Act and redressable through a favorable judgment on the merits. "If a [government] action causes an injury, enjoining the action . . . will typically redress that injury." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Such is true here.

In concluding otherwise, the district court placed too much weight on the Massachusetts Supreme Judicial Court's decision in *Lunn v. Commonwealth*, 78 N.E.3d 1143 (Mass. 2017). *Lunn* holds that state law does not authorize state officers to retain custody over (and thereby arrest) an individual based only on a civil immigration detainer. *See id.* But even accepting *Lunn* as establishing a valid rule of law, the Boston

Trust Act still operates as a concrete obstacle to the enforcement of federal law—generally barring cooperation by local officers with federal officers even if such cooperation would not require maintaining custody based on civil immigration detainers. Those distinct injuries are sufficient for standing.

The district court separately erred by rejecting the federal government's express preemption arguments on the merits. Doing so was improper under the guise of standing. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975). But even setting that aside, the court misconstrued the statutory text. Federal law prohibits all restrictions on sharing "information regarding . . . citizenship or immigration status," *see* 8 U.S.C. § 1373(a), yet the Boston Trust Act bars sharing exactly that information—most notably, information that determines whether an alien is subject to immediate removal or ineligible for removal. As a result, the relevant portions of the Boston Trust Act run afoul of the Supremacy Clause and must yield.

## STANDARD OF REVIEW

This Court reviews a dismissal for lack of standing de novo. *Wiener v. MIB Grp., Inc.*, 86 F.4th 76, 83 (1st Cir. 2023). When that dismissal

was "based on the face of the . . . complaint," the Court must take the complaint's "well-pleaded facts as true and indulge all reasonable inferences in [the plaintiff]'s favor." *Id.* (quotation marks omitted).

## ARGUMENT

## THE FEDERAL GOVERNMENT HAS STANDING TO CHALLENGE THE BOSTON TRUST ACT

In 2014, Boston enacted the Boston Trust Act, a local ordinance that bars virtually all cooperation with federal immigration authorities. *See* A62-67 (copy of Act as amended in 2019); Bos., Mass., Mun. Code ch. 11, § 1.9. In doing so, the Boston Trust Act makes it more difficult for federal officials to enforce the federal immigration laws—a classic injury that is sufficient to confer standing. Nevertheless, the district court dismissed the federal government's complaint on standing grounds. This Court should reverse.

### A. The Boston Trust Act Harms the United States By Impeding Cooperation

To establish standing, the federal government was required to show a concrete injury, traceable to defendants' allegedly unlawful conduct, and redressable through a favorable judgment. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). And this Court must treat all well-pleaded allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Here, the federal government more than adequately established its standing.

The Boston Trust Act harms the federal government. The Boston Trust Act bars virtually all cooperation with federal immigration authorities. *See* A62-67; Bos., Mass., Mun. Code ch. 11, § 1.9. Absent narrow exceptions, local officers cannot take a wide range of actions to aid the federal government with regard to immigration enforcement. Most relevant here, they may not take basic actions that would facilitate the orderly transfer of custody from local officials to federal detention, including arranging for the orderly transfer of individuals into federal custody, A66; Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(b), or maintaining custody themselves for a brief period to facilitate the transfer, A65; Bos., Mass., Mun. Code ch. 11, § 1.9(B). Indeed, local officials cannot even communicate basic information to immigration officers absent narrow exceptions. *See* A66; Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a)(3)-(4). Without any cooperation from local authorities,

federal immigration officers are hampered in their ability to enforce federal immigration law in Boston.

As many other courts have held, that is a sufficient injury in fact to support standing. Indeed, it is well established that the federal government can sue to vindicate its "legally protected interest in enforcing federal law," *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024); *see also Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *United States v. Colorado Supreme Ct.*, 87 F.3d 1161, 1165 (10th Cir. 1996); *United States v. Arlington Cnty.*, 669 F.2d 925, 929 (4th Cir. 1982). And many district courts have applied that rule in finding the federal government has standing to challenge provisions virtually identical to the Boston Trust Act. *See, e.g.*, *United States v. Illinois*, 796 F. Supp. 3d 494, 509 (N.D. Ill. 2025) (holding the government had standing to challenge sanctuary policies that "explicitly prohibit state and local law enforcement from complying with detainers and administrative warrants, providing information about noncitizens, and granting federal immigration authorities access to detainees in state custody"); *United States v. Minnesota*, No. 25-cv-3798, 2026 WL 2085701, at *9 (D. Minn. July 20, 2026) (similar); *United States v. County of*

*Washtenaw*, No. 26-11166, 2026 WL 2453724, at *5 (E.D. Mich. Aug. 21, 2026) (similar); *United States v. New Jersey*, No. 26-1770, 2026 WL 2621025, at *3 (D.N.J. Sep. 4, 2026) (similar).

Indeed, these harms are especially acute in this case given Boston's historic cooperation with federal immigration authorities. As the complaint explains, federal immigration authorities "perform[] a significant portion of [their] law enforcement activities in" Boston, A48, and until recently, Boston had been a "cooperative partner" in those efforts, A51. But Boston ceased that cooperation following the Boston Trust Act. A51. For example, in 2024, Boston refused to comply with 15 civil immigration detainers. A87. And Boston has refused to provide immigration authorities with access to city facilities, preventing "safe custodial transfer" of aliens. A52.

The federal government's harm is also traceable to the Boston Trust Act and would be redressed through a favorable judgment on the merits. These requirements are "often flip sides of the same coin," directed at whether "the plaintiff's injury likely was caused or likely will be caused by the defendant's conduct." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380, 382 (2024) (quotation marks omitted). And "[i]f a

[government] action causes an injury, enjoining the action . . . will typically redress that injury." *Id.* at 381.

Here, the causation question is straightforward. The Boston Trust Act prohibits virtually any cooperation with federal immigration authorities. That prohibition, in turn, makes enforcing the immigration laws more difficult—as explained above. And by extension, enjoining the Boston Trust Act would provide effective relief. That is all that is required to establish standing.

### B. The Massachusetts Supreme Judicial Court's Decision in *Lunn* Does Not Negate Standing

Notwithstanding this straightforward conclusion, the district court dismissed the federal government's complaint on standing grounds. In doing so, it primarily relied on the Massachusetts Supreme Judicial Court's decision in *Lunn v. Commonwealth*, 78 N.E.3d 1143 (Mass. 2017). But that decision cannot bear the weight the district court placed on it.

For the federal government to lack standing based on *Lunn*, the Boston Trust Act would have to be essentially a nullity—having no legal impact independent of *Lunn*. But there is no basis for such a conclusion on this record, and it is thus unsurprising that Boston did not raise a standing argument until prompted by the district court. Indeed, Boston

amended its Trust Act as recently as 2019, two years after the *Lunn* decision issued, and presumably, those amendments were intended to have some effect. *Cf. Stone v. INS*, 514 U.S. 386, 397 (1995) (statutory amendments are presumed to have "real and substantial effect"). Indeed, the 2019 amendment expanded the Boston Trust Act significantly, adding numerous restrictions on local officers' ability to cooperate with federal authorities. And those restrictions forward the Boston Trust Act's core purpose: restricting the ability of local law-enforcement officials to cooperate with the federal government. That burden on federal officials' ability to enforce federal law is an injury that would be redressed through a favorable judgment on the merits.

Even a cursory analysis of *Lunn* confirms that the decision did not go nearly as far as the Boston Trust Act. In *Lunn*, the Massachusetts Supreme Judicial Court addressed how state law impacts officers' ability to cooperate with immigration detainers. The individual-petitioner, Sreynuon Lunn, had been detained by state court officers pursuant to a federal immigration detainer—even after all criminal charges against him had been dropped. In that circumstance, given that Lunn had been detained "based strictly on a [f]ederal immigration detainer," his

detention qualified as an arrest "as a matter of Massachusetts law." *Lunn,* 78 N.E.3d at 1153. And the court found no authority in state law that would allow for such an arrest—primarily discussing state common law and statutory provisions. *Id.* at 1154-58. Thus, in short, *Lunn* holds that state law does not authorize state officers to retain custody over (and thereby arrest) an individual based only on a civil immigration detainer.

Even accepting *Lunn* as establishing a valid rule of law, the Boston Trust Act still operates as a concrete obstacle to the enforcement of federal law. As explained, the Boston Trust Act prohibits far more than detaining a prisoner after his release date. Under that Act, local officials are barred from essentially all cooperation with civil immigration enforcement efforts. Although civil immigration enforcement may involve immigration detainers and administrative warrants, those are far from the only activity that would benefit from local cooperation. And by withholding that cooperation, the Boston Trust Act imposes a concrete harm that justifies standing.

For example, even if a local official has independent authority under local law to continue to hold a criminal alien in an individual case after the completion of a sentence, the Boston Trust Act could prohibit

that continued detention to the extent it was designed to comply with a federal detainer. In addition, if a local official would have the ability to facilitate a transfer of custody without extending the period of state custody, the Boston Trust Act prohibits doing even that. These examples highlight that the district court was wrong to conclude that the Boston Trust Act had no practical effect such that the United States could not even proceed past the motion-to-dismiss stage.

### C. The District Court Erred in Resolving the Government's Express Preemption Argument on the Merits

The district court committed another legal error, resolving the merits of the federal government's claims under the guise of standing—and resolving it incorrectly. "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *See Warth v. Seldin*, 422 U.S. 490, 500 (1975). The question is whether a favorable judgment would redress the plaintiff's injury, not whether the plaintiff is likely to obtain a favorable judgment. The court was therefore wrong to resolve the federal government's express-preemption arguments on the merits in the guise of analyzing the government's standing. A21-24.

But even setting that aside, the district court's analysis of the merits was flawed. The Boston Trust Act includes an express bar on information sharing, preventing local officials from sharing an individual's "personal information" or prison release date with federal immigration authorities—at least absent narrow exceptions. A66; Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a)(3)-(4). That provision cannot be reconciled with the INA.

**1.** Federal law establishes an "extensive and complex" framework governing immigration, most relevantly to how immigration enforcement interacts with a State's interest in prosecuting state crimes. *See Arizona v. United States*, 567 U.S. 387, 395 (2012). Federal authorities are required to detain aliens who have committed specified crimes—including state crimes. *Id.* at 396; *see* 8 U.S.C. §§ 1182(a)(2), 1227(a)(2). But for those aliens in state custody, that detention comes only after the alien has served his state criminal sentence. Still, once a criminal alien is released from state custody, he must be detained by federal immigration authorities. *See* 8 U.S.C. §§ 1226(c), 1231(a). And for a criminal alien already subject to a removal order at the time of release,

that individual must be removed from the country within 90 days. *Id.* § 1231(a)(4)(A).

Those provisions work in conjunction with laws governing the sharing of information between federal and local officials relating to immigration enforcement. Generally, federal law assumes the free flow of information between local and federal authorities—including because it contemplates the orderly transfer of aliens from state to federal custody following a term of state imprisonment. To protect that flow of information, Congress barred localities from restricting local officers' ability to share "information regarding the citizenship or immigration status . . . of any individual" with federal authorities. *See* 8 U.S.C. § 1373(a). And that communication is a two-way street: federal officials must provide information relating to immigration status to state officials upon request. *Id.* § 1373(c).

Altogether, these provisions reflect a comprehensive, cooperative scheme governing the regulation of aliens who may be of interest both to States under their criminal laws and to the federal government under the immigration laws. States and localities are entitled to detain and prosecute such aliens, notwithstanding their eligibility for removal under

federal law, if they elect to do so. And Congress contemplated that once the period of local custody ends, the alien will be transferred to federal custody. That process requires a certain degree of coordination between local and federal officials, including open lines of communication.

The Boston Trust Act's information-sharing restriction cannot be reconciled with this scheme. That is evident from the very nature of the cooperation contemplated by the INA. Congress instructed federal officials to assume custody immediately at the conclusion of the sentence under state or local law, and a prohibition on providing basic information to facilitate that transfer "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

**2.** As noted, Congress also codified its desire for information to flow freely in an express-preemption provision. Section 1373(a) prohibits localities from imposing limitations on the sharing of "information regarding the citizenship or immigration status . . . of any individual." In the context of a federal scheme in which the authority—and in some cases the obligation—to remove an individual from the United States depends on the date on which a period of local custody concludes, that phrase

plainly includes the sort of information covered by the Boston Trust Act such as the release date that triggers a change in immigration status. The district court was mistaken to suggest that Congress somehow left room for localities to deny federal officials the precise information they need to carry out federal immigration law.

The phrase "citizenship or immigration status," as used in § 1373(a), refers to a person's legal classification under federal law. The same subsection explains that, at least by way of example, an individual's "immigration status" may be "lawful or unlawful," referring to the individual's lawful presence in the country. 8 U.S.C. § 1373(a); *see also id.* § 1373(b) (same); *id.* § 1644 (similar). And other provisions in the immigration scheme are in accord. *See, e.g.*, *id.* § 1255(c) (referencing "unlawful immigration status"); *id.* § 1357(g)(10)(A) (whether an alien is "lawfully present" provided as an example of information "regarding . . . immigration status"). Thus, by itself, the phrase "citizenship or immigration status" covers any legal classification under the immigration laws—*e.g.*, whether an individual is a citizen, national, alien, or a lawful permanent resident and, with regard to aliens, whether they are removable.

But Congress also chose to expand the scope of § 1373(a) beyond legal classifications of citizenship or immigration status. States are forbidden from imposing restrictions on the ability to share any "information *regarding* . . . citizenship or immigration status" with federal immigration authorities. 8 U.S.C. § 1373(a) (emphasis added). By using the word "regarding," Congress intended "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018); *see also Xia v. Bondi*, 137 F.4th 85, 91 (2d Cir. 2025). At minimum, this must include facts that bear on an individual's citizenship or immigration status.

The statutory structure confirms as much. In the same section, Congress requires DHS to respond to information requests "seeking to verify or ascertain the citizenship or immigration status of any individual." 8 U.S.C. § 1373(c). The absence of "regarding" in Subsection (c) underscores the need to give effect to the breadth the word carries in Subsection (a). *See Rudisill v. McDonough*, 601 U.S. 294, 308 (2024) (presumption that "differences in language like this convey differences in meaning" (quotation marks omitted)). Congress must have

intended § 1373(a) to reach information beyond the legal status of individuals.

Consideration of legislative history would only reaffirm the point. When Congress first prohibited restrictions on the sharing of "information regarding" an alien's "immigration status," a House Conference Report explained that such provisions were intended to enable state and local officials to "communicate with the [Immigration and Naturalization Service (INS)] regarding the presence, whereabouts, or activities of illegal aliens." H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.); *see id.* (The provision "is designed to prevent any State or local" prohibition or restriction on "any communication between State and local officials and the INS."). Likewise, the Senate Report accompanying § 1373 explained that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S. Rep. No. 104-249, at 19-20 (1996).

The Boston Trust Act's communications restrictions are expressly preempted by 8 U.S.C. §§ 1373 and 1644. Under the Boston Trust Act,

city officers cannot share an individual's "personal information" or his "release date or time" with specified federal immigration authorities—absent narrow exceptions. A66; Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a)(3)-(4). And the statute defines "personal information" to include "any information that is maintained by an agency that identifies or describes an individual, that can be used, either alone or in combination with other information, to identify individual subjects, such as his or her name, social security number, physical description, home address, and/or work address." A64; Bos., Mass., Mun. Code ch. 11, § 1.9(A). Defined in this way, the non-communication provision bars sharing "information regarding . . . immigration status." *See* 8 U.S.C. § 1373(a). Thus, this provision runs headlong into a federal statute and is accordingly preempted.

An alien's release date from state or local custody illustrates the point. The INA provides that an alien with a final order of removal cannot be removed "until [he] is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A). That is, such an alien is a removable alien but is authorized to be present in the country in a state or local prison. But upon his release date, that authorization terminates and his right to stay

in the country changes—he can no longer stay in the United States and must be detained by the Attorney General while his removal is being effectuated. *See id.* § 1231(a)(1)(A), (2)(A). It is analogous to parole, which is relevant in determining whether an alien is in lawful immigration status. *See* 8 C.F.R. § 245.1(d)(1)(v) (defining "lawful immigration status" for purposes of adjustment of status).

In addition, other information that falls within the express terms of the non-communication provision constitutes "information regarding . . . immigration status." For example, an alien's current address, *see* § 508(3), whether an alien has a social security number, *see id.*, and an alien's employment status, *see id.*, can all be relevant to immigration status, *see* 8 U.S.C. § 1306(b) (failure to update address information results in mandatory detention and removal); *id.* §§ 1182(a)(6)(F)(i), 1227(a)(3)(C) (immigration consequences for fraudulent social security numbers); *id.* §§ 1182(a)(6)(C)(ii)(I), 1227(a)(3)(D)(i) (immigration consequences for working without authorization). And the Boston Trust Act includes this exact information in its definition of "personal information," which generally cannot be shared with federal immigration authorities. *See* A64; Bos., Mass., Mun. Code ch. 11, § 1.9(A).

The Boston Trust Act includes a savings clause, stating that the statute "does not prohibit or restrict any government agency from complying with Sections 1373 and 1644 of Title 8 of the United States Code." A67; Bos., Mass., Mun. Code ch. 11, § 1.9(D)(3). But that clause does not change the preemption analysis here, and the district court was wrong to conclude otherwise.

Initially, it is clear that the Boston Trust Act has no impact on the parties' core dispute. The federal government, reading the plain statutory text, understands § 1373 to prohibit restrictions on sharing "information *regarding* . . . immigration status"—a phrase broad enough to encompass at least address and release-date information. And Boston does not argue that the Boston Trust Act's savings clause allows sharing that kind of information. Instead, Boston argues that the federal government misinterprets § 1373. That is a dispute about the meaning of federal law, and the savings clause has no bearing on that dispute.

Boston's actual practices and litigating positions are sufficient to demonstrate the point. As the complaint explained, Boston has been denying federal officers access to "personal information" and release dates for more than a decade—primarily citing the Boston Trust Act as

its basis for doing so. A51-52. If the savings clause were truly effective at preserving the Boston Trust Act's validity, then those denials make no sense. As explained, to fully comply with § 1373, Boston would need to share certain personal information with federal authorities. The fact that it is not doing so is enough evidence that the savings clause is not working to preserve the validity of the Boston Trust Act.

In any event, this conclusion also follows from the statutory text. A generic savings clause does not and cannot override more specific prohibitions in statutory language. *See, e.g.*, *Shomberg v. United States*, 348 U.S. 540, 547-48 (1955). The reasoning in *Shomberg* provides a useful illustration of the point. There, the Court considered a savings clause in the original INA. Immigration and Nationality Act of 1952, Pub. L. 82-414, § 405, 66 Stat. 163, 280. That provision, § 405(a), generally preserved already-existing rights that arose under the prior immigration system. But the Court recognized this grandfathering clause was nonetheless subject to any "specific provision to the contrary" in the INA. *Shomberg*, 348 U.S. at 543. And it interpreted another part of the Act, § 318, as just such a provision. *See id.*

Indeed, this is nothing more than an application of the "well-established principle" that a specific statute controls in the face of a conflicting, more-general provision. *Hinck v. United States*, 550 U.S. 501, 506 (2007); *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). In such circumstances, "the specific provision comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 183 (2012). Almost by definition, a savings clause is general in its terms—carving out compliance with some other provision of law. And such a general provision must yield in the face of unambiguous, specific text to the contrary.

Here, as explained, the Boston Trust Act includes clear and specific language that runs headlong into § 1373(a). By expressly prohibiting disclosure of release dates and all "personal information," including for example addresses, the Boston Trust Act restricts the free flow of "information *regarding* . . . immigration status." *See* 8 U.S.C. § 1373(a) (emphasis added). Nothing about the Boston Trust Act is ambiguous or unclear in this regard, and as a result, the savings clause simply has no application. And even if it did, any conflict between the provisions would

result in the more-specific information sharing restrictions controlling over the more generic savings clause.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, and this Court should remand for further proceedings.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

LEAH B. FOLEY
*United States Attorney*

DANIEL TENNY

*s/ J. Kain Day*
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4214*
*j.kain.day@usdoj.gov*

October 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 7,165 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ J. Kain Day*
J. Kain Day

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. All parties are represented by counsel, who will be served via CM/ECF.

*s/ J. Kain Day*
J. Kain Day

# ADDENDUM

# TABLE OF CONTENTS

Order on Defendants' Motion to Dismiss,
Dkt. No. 72 (May 28, 2026) ........ A1

Order of Dismissal,
Dkt. No. 73 (May 28, 2026) ........ A26

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

THE CITY OF BOSTON et al.,

Defendants.

Civil No. 25-12456-LTS

ORDER ON DEFENDANTS' MOTION TO DISMISS (DOC. NO. 15)

May 28, 2026

SOROKIN, J.

More than a decade ago, the City of Boston adopted the Boston Trust Act, an ordinance limiting the City's cooperation with federal civil immigration enforcement. In September 2025, the United States sued the City (along with the Boston Police Department, Mayor, and Police Commissioner), seeking an injunction barring enforcement of the Boston Trust Act as well as a declaration of the Act's invalidity. The United States has not moved for a preliminary injunction. Pending before the Court is the defendants' motion to dismiss.

The United States' claims fail at the threshold because it lacks standing—specifically, the United States has not made a plausible showing that its alleged injuries are redressable by the judicial relief it seeks. For that reason, and as further explained below, the motion to dismiss (Doc. No. 15) is ALLOWED.

I. BACKGROUND

A. Federal Statutory and Regulatory Framework

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." Arizona v. United States, 567 U.S. 387, 394 (2012). "This authority rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization' and its inherent power as sovereign to control and conduct relations with foreign nations." Id. at 394–95 (citations omitted) (quoting U.S. Const. art. I, § 8, cl. 4). "The foundation of our laws on immigration and naturalization is the Immigration and Nationality Act (INA), . . . which sets out the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." Kansas v. Garcia, 589 U.S. 191, 195 (2020) (citation modified). "Agencies in the Department of Homeland Security," (or "DHS"), including Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP"), "play a major role in enforcing the country's immigration laws." Arizona, 567 U.S. at 397; see also, e.g., 8 U.S.C. § 1103(a).

Two categories of INA provisions and DHS regulations are pertinent here. See Doc. No. 1 ¶¶ 18–28;[1] see also United States v. Illinois, 796 F. Supp. 3d 494, 505 (N.D. Ill. 2025). First are provisions related to immigration detainers and administrative warrants. The INA authorizes federal immigration officers to use administrative warrants to arrest and detain certain noncitizens "pending a decision on whether the alien is to be removed from the United States."[2] 8 U.S.C. § 1226(a). In some circumstances, detention is mandatory rather than discretionary.

[1] Citations to "Doc. No. __" reference items appearing on the Court's electronic docketing system ("ECF"); pincites are to the page numbers in the ECF header or, for documents enumerated by paragraph, to paragraph numbers.

[2] This Order uses the term "noncitizen" as equivalent to the statutory term "alien." See 8 U.S.C. § 1101(a)(3); Nasrallah v. Barr, 590 U.S. 573, 578 n.2 (2020).

See Hernandez-Lara v. Lyons, 10 F.4th 19, 26 (1st Cir. 2021); Gomes v. Hyde, 804 F. Supp. 3d 265, 269–70 (D. Mass. 2025). If a noncitizen has committed certain criminal offenses or is affiliated with terrorist activity, the federal government "shall" take the noncitizen into custody upon their release by arresting authorities. 8 U.S.C. § 1226(c)(1). Under the Laken Riley Act, if a noncitizen is inadmissible on certain grounds and is charged with, arrested for, or convicted of certain violent offenses, DHS "shall issue a detainer" for that person and, if the person is not otherwise detained, DHS "shall effectively and expeditiously take custody" of them.[3] Id. § 1226(c)(1)(E), (c)(3). If a noncitizen is subject to a final order of removal, the federal government "shall remove" that person from the United States within a specified removal period, which begins—if the person is "detained or confined (except under an immigration process)"—on the day the person is "released from detention or confinement." Id. § 1231(a)(1)(B)(iii). If a noncitizen is "sentenced to imprisonment," DHS generally "may not remove" that noncitizen until they are "released from imprisonment." Id. § 1231(a)(4)(A). This restriction does not apply to noncitizens who face criminal charges but have not yet been sentenced.

DHS regulations authorize immigration officers to issue immigration "detainers" to any other federal, state, or local law enforcement agency. 8 C.F.R. § 287.7(a). "A detainer serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." Id. A detainer is "a request that such agency advise [DHS], prior to release of the alien, in order for [DHS] to arrange to assume custody, in situations when gaining immediate physical custody is either

---

[3] This provision is one of only two references to immigration detainers in the INA. The other arises when a noncitizen is arrested for violation of a controlled-substances law and the arresting official requests that DHS determine whether to issue a detainer. 8 U.S.C. § 1357(d). If DHS does issue a detainer and the noncitizen "is not otherwise detained," "the Attorney General shall effectively and expeditiously take custody" of the noncitizen. Id.

impracticable or impossible." Id. If DHS issues a detainer for a noncitizen who is "not otherwise detained by a criminal justice agency," DHS may request that the agency "maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by [DHS]." Id. § 287.7(d); see also Dep't of Homeland Sec., Form I-274A, Immigration Detainer—Notice of Action (2017) ("It is therefore requested that you . . . [m]aintain custody of the alien for a period not to exceed 48 hours beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody." (emphasis omitted)); Morales v. Chadbourne, 793 F.3d 208, 212 (1st Cir. 2015) ("[A]n immigration detainer . . . is a request from ICE to another law enforcement agency to detain a non-citizen up to 48 hours so that ICE may investigate whether the non-citizen is subject to deportation." (citing 8 C.F.R. § 287.7(a), (d))); Galarza v. Szalczyk, 745 F.3d 634, 639–42 (3d Cir. 2014) (rejecting argument that detainers issued pursuant to 8 C.F.R. § 287.7(d) impose mandatory obligations on state and local agencies to detain noncitizens).

The second category of statutory and regulatory provisions at issue here comprises those related to information sharing and cooperation. As the Supreme Court has noted, "[c]onsultation between federal and state officials is an important feature of the immigration system." Arizona, 567 U.S. at 411. Congress "has encouraged the sharing of information about possible immigration violations." Id. at 412 (citing 8 U.S.C. § 1357(g)(10)(A)). Several statutory provisions prohibit restrictions on the sharing of "information regarding the citizenship or immigration status" of individuals:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

8 U.S.C. § 1373(a); see also id. § 1373(b) (similar); id. § 1644 (similar). As other federal courts have concluded, the "phrase 'information regarding the citizenship or immigration status, lawful or unlawful, of any individual' is naturally understood as a reference to a person's legal classification under federal law." United States v. California, 921 F.3d 865, 891–92 (9th Cir. 2019); see also, e.g., Illinois, 796 F. Supp. 3d at 516–19 (collecting cases).

More generally, the INA authorizes voluntary cooperation, formal and informal, between local, state, and federal officials. States and localities may voluntarily enter into written agreements with DHS—often called "287(g) agreements"—authorizing state or local officers to perform the functions of an immigration officer "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1); see also id. § 1357(g)(9) ("Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection."). The INA does not require a formal 287(g) agreement in order for state and local officials to communicate with DHS "regarding the immigration status of any individual" or to otherwise "cooperate" with DHS in the "identification, apprehension, detention, or removal of aliens not lawfully present in the United States." Id. § 1357(g)(10).

B. State and Local Law

Holding or detaining a person beyond the time the person would otherwise be released from state custody constitutes an "arrest" under Massachusetts law. Lunn v. Commonwealth, 78 N.E.3d 1143, 1153 (Mass. 2017) (per curiam). Whether state and local officers have authority to effect an arrest is a question of Massachusetts common and statutory law. Id. at 1154 ("The authority to arrest is generally controlled by Massachusetts common law and statutes, which confer the power and also define the limits of that power."). Massachusetts officers do not have

"inherent authority" to make arrests beyond the scope of authority established in the common law and by statute. Id. at 1157–58.

In 2017, the Massachusetts Supreme Judicial Court held that Massachusetts law "provides no authority" for state or local law enforcement officers to "arrest [or] hold an individual solely on the basis of a [f]ederal civil immigration detainer[] beyond the time the individual would otherwise be entitled to be released from [s]tate custody." Id. at 1160. Likewise, Massachusetts law enforcement officers lack authority to conduct arrests pursuant to civil administrative warrants issued by federal immigration officials. Id. at 1155 & n.21. In Massachusetts, state and local law enforcement officers may not detain a noncitizen solely based on a federal civil immigration detainer or administrative warrant because no Massachusetts authority empowers them to do so.[4]

The Boston Trust Act is an ordinance that limits the City of Boston's official cooperation with federal civil immigration enforcement. The Boston City Council adopted the Boston Trust Act in 2014 and amended the Act to its present form in 2019. Doc. Nos. 1-1, 1-2; Bos., Mass., Mun. Code ch. 11, § 1.9 (2019). The Act was originally adopted "to establish the City's policy for responding to ICE's civil immigration detainer requests." Doc. No. 1-1 at 2. The City Council found, among other things, that "[w]hen local law enforcement officials indiscriminately

[4] The Lunn court acknowledged that Congress could, in some circumstances, confer authority on state or local officials to make arrests for violations of federal law, but it concluded Congress had not done so with respect to civil immigration detainers, Lunn, 78 N.E.3d at 1154, 1156–60, and so it did not address whether such arrests (if authorized) would comply with the United States or Massachusetts constitutions, id. at 1146 n.1. The United States appeared as amicus curiae and participated in oral argument the 2017 Lunn case. Id. at 1146–47 n.3. In that case, the United States "[did] not contend that § 1357(g)(10) affirmatively confers authority on State and local officers to make arrests pursuant to civil immigration detainers, where none otherwise exists." Id. at 1158 (emphasis in original). Here, the United States does not argue that federal law independently confers authority on state and local officers that they lack as a matter of state law.

honor all ICE civil immigration detainer requests, including those that target non-criminal aliens, immigrant residents are less likely to cooperate and public trust erodes, hindering the ability and effectiveness of Boston's police force." Id.

The Boston Trust Act provides: "A [City of Boston] law enforcement official shall not detain an individual solely on the basis of a civil immigration detainer request or an ICE administrative warrant after the individual is eligible for release from custody, unless ICE has a criminal warrant, issued by a Judicial Officer, for the individual." Bos., Mass., Mun. Code ch. 11, § 1.9(B). The Act prohibits Boston law enforcement officials and city employees from using "monies or personnel to interrogate, detain or arrest persons for immigration enforcement purposes, that are otherwise the responsibility of [ICE]," including the following:

1. Inquiring of an individual his or her immigration status;
2. Detaining an individual solely on the basis of a civil immigration detainer request;
3. Providing personal information . . . or [information] regarding a person's release date or time to [ICE];
4. Providing personal information . . . or [information] regarding a person's release date or time to ICE-HSI solely for the purpose of enforcing civil violations of United States immigration laws;[5]
5. Making arrests based solely on ICE administrative warrants including administrative warrants after the individual is eligible for release from custody; and
6. Performing the functions of an Immigration Officer.

Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a); see also id. § 1.9(A) (defining "personal information" as "[a]ny information that is maintained by an Agency that identifies or describes an individual, that can be used, either alone or in combination with other information, to identify

[5] ICE-HSI is the Homeland Security Investigations component of ICE. Bos., Mass., Mun. Code ch. 11, § 1.9(A).

individual subjects, such as his or her name, Social Security number, physical description, home address and/or work address”). It also prohibits City officials from “[t]ransfer[ring] an individual to immigration authorities unless authorized by a judicial warrant or other judicial order.” Id. § 1.9(D)(1)(b).

The Trust Act’s scope is circumscribed. For one, the Act “does not prevent any Boston law enforcement official or [City] employee” from responding to requests from ICE-HSI for information regarding a person’s criminal history, or from conducting joint investigations and law enforcement activities “so long as the primary purpose of the partnership or task force is not to enforce civil violations of United States immigration laws.” Id. § 1.9(D)(2)(b)–(c). It also does not prohibit Boston police officers from detaining or arresting people suspected of committing certain federal crimes, including the offense of illegal reentry. Id. § 1.9(D)(2)(a), (e) (citing 8 U.S.C. § 1326(a), (b)(2); 18 U.S.C. § 922(d)(5)). The Act contains a savings clause regarding information sharing: “This [Act] does not prohibit or restrict any government Agency from complying with 8 U.S.C. §§ 1373 and 1644.” Id. § 1.9(D)(3).

In 2015, the Boston Police Department “honored all [nine] civil immigration detainer requests from ICE.” Doc. No. 1 ¶ 39; see also Doc. No. 1-3. “But every year since then,” the Department has “refus[ed] to honor any of ICE’s civil immigration detainers,” and its “proffered reason for refusing to honor ICE’s immigration detainer requests is the Boston Trust Act.” Doc. No. 1 ¶¶ 39, 40 & n.3; see also Doc. Nos. 1-4 to -10 (annual Boston Trust Act reports).

The complaint alleges that, “upon information and belief, because of the challenged laws, DHS lacks the ability to consistently and readily obtain from local law enforcement the release dates of aliens whom DHS has reason to believe are removable from the United States, and DHS lacks access to such aliens to facilitate the transfer of custody, even where DHS presents a

congressionally authorized civil administrative warrant of arrest or removal, see [8 U.S.C.] §§ 1226(a), 1231(a), or has transferred those aliens to local law enforcement in the first instance to permit their prosecution for a state crime."[6] Doc. No. 1 ¶ 46. According to the complaint, "the Boston Trust Act requires federal immigration officers either (1) to engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody, endangering immigration officers, the particular alien, and others who may be nearby, or (2) to determine that it is not appropriate to transfer an alien to local custody in the first place, in order to comply with their mission to enforce the immigration laws." Id. ¶ 47.

C. Procedural History

On September 4, 2025, the United States filed suit against the City of Boston, the Boston Police Department, Boston Mayor Michelle Wu, and Boston Police Commissioner Michael Cox. Doc. No. 1. The United States' challenge centers on two aspects of the Boston Trust Act: (1) the Act's prohibition on holding or arresting individuals solely on the basis of civil immigration detainers and administrative warrants, Bos., Mass., Mun. Code ch. 11, § 1.9(B), (D)(1)(a)(2), (5); and (2) its restriction on the sharing of personal information and release date and time with ICE officers, id. § 1.9(D)(1)(a)(3)–(4). See Doc. No. 1 ¶¶ 54, 59, 63; see also Doc. No. 53 at 11–14, 18–19, 23; Doc. No. 61 at 3 (arguing "the United States has plausibly alleged each element of standing with respect to the Trust Act's detainer and information sharing provisions"). The United States advances three claims under the Supremacy Clause: (1) that the Boston Trust Act is preempted by federal immigration law, (2) that enforcement of the Boston Trust Act

[6] The complaint also alleges that, "[a]ccording to ICE, the Boston Police Department has refused to provide ICE agents access to the City's detention areas to arrange for a safe custodial transfer of an alien even when ICE agents are present at the police station and capable of taking custody of that alien." Doc. No. 1 ¶ 41. But the complaint does not cite a provision of the Boston Trust Act that requires this refusal or otherwise allege it is a consequence of the Trust Act.

discriminates against the federal government, and (3) that enforcement of the Boston Trust Act directly regulates the federal government. Doc. No. 1 ¶¶ 52–64. The complaint seeks an injunction barring the defendants from enforcing the Boston Trust Act, a declaratory judgment that the Act violates the Supremacy Clause and 8 U.S.C. § 1373, and fees and costs. Id. at 16. The United States has never moved for a preliminary injunction or otherwise sought expedited relief or resolution.

On November 17, 2025, the defendants moved to dismiss the complaint. Doc. No. 15. The motion to dismiss is fully briefed.[7] Doc. Nos. 16, 53, 58. On March 18, 2026, the Court ordered the parties to file supplemental memoranda addressing the United States' Article III standing as to each claim and form of relief sought. Doc. No. 59. The standing issue is also fully briefed. Doc. Nos. 61, 65, 66. The Court heard oral argument on May 13, 2026, and it now resolves the motion to dismiss.

## II. LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In so doing, the complaint must advance "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997). Courts must "take all

---

[7] The Court recognizes the amicus briefs filed by Six Law Enforcement Officers (Doc. No. 41); American Civil Liberties Union of Massachusetts, Brazilian Women's Group, Cape Cod Coalition for Safe Communities, Dignidad, Dominican Development Center, Inc., East Boston Community Council, Greater Boston Legal Services, Haitian American New Vision of Waltham, Haitian Americans United, Immigrant Support Alliance, International Institute of New England, Jane Doe Inc., Massachusetts Immigrant and Refugee Advocacy Coalition, Massachusetts Law Reform Institute, Sisters of St. Joseph of Boston, Student Clinic for Immigrant Justice, and the Watertown Citizens for Peace, Justice & the Environment (Doc. No. 42); Twenty-Seven Cities, Counties, and Elected Officials (Doc. No. 43); the Commonwealth of Massachusetts (Doc. No. 44); and Federation for American Immigration Reform (Doc. No. 57).

factual allegations [in the complaint] as true and . . . draw all reasonable inferences in favor of the plaintiff." Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007). But "[t]he court need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim, . . . nor must a court infer from the assertion of a legal conclusion that factual allegations could be made that would justify drawing such a conclusion." Cordero-Hernández v. Hernández-Ballesteros, 449 F.3d 240, 244 n.3 (1st Cir. 2006).

As the party invoking federal jurisdiction, the United States bears the burden of demonstrating that it has standing. TransUnion LLC v. Ramirez, 594 U.S. 413, 430 (2021). "A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" Id. at 431 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)); see also Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 371 (1st Cir. 2023) (noting typical plausibility standard applies when evaluating standing at motion-to-dismiss stage).

## III. DISCUSSION

### A. Proper Defendants

In their motion to dismiss, the defendants argue that the United States fails to state a claim against Mayor Wu and Commissioner Cox, that it lacks standing as to them, and that any claims against them in their official capacities are redundant with the claims against the City in any event. Doc. No. 16 at 20–21. The defendants also point out that the Boston Police Department is not a suable entity—a status reflected in a long line of cases. Id. at 21 (citing Douglas v. Bos. Police Dep't, No. 10-cv-11049-WGY, 2010 WL 2719970, at *2 (D. Mass. July 1, 2010)). The United States failed to respond to these arguments in its opposition brief. See generally Doc. No. 53; see also Doc. No. 58 at 11 (noting failure to respond). At oral argument, the United States confirmed it has no objection to the dismissal of Mayor Wu, Commissioner

Cox, or the Boston Police Department as defendants. Doc. No. 70 at 4–6. The motion to dismiss (Doc. No. 15) is therefore ALLOWED with respect to all claims against Mayor Wu, Commissioner Cox, and the Boston Police Department.

B. Standing

The Court now turns to the United States' standing to bring the claims it asserts against the City of Boston. The United States has failed to plausibly show that its alleged injuries are redressable by this Court's judgment. It therefore lacks Article III standing, and the motion to dismiss must be allowed.

Federal courts are courts of limited jurisdiction. A federal district court is not a roving beacon of justice, free to opine on each question any party presents, no matter how consequential. See Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 378–82 (2024). Instead, a federal court's power is limited to actual "Cases" and "Controversies" within its jurisdiction. U.S. Const. art. III, § 2; see also, e.g., Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016) ("[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997))).

"A proper case or controversy exists only when at least one plaintiff establishes that she has standing to sue." Murthy v. Missouri, 603 U.S. 43, 57 (2024) (citation modified). The party invoking federal jurisdiction (here, the United States) bears the burden to establish the "irreducible constitutional minimum" of Article III standing—that it (1) has suffered a cognizable injury in fact that is both (2) traceable to the challenged conduct of the defendant and (3) likely to be redressed by a favorable judicial decision. See Spokeo, 578 U.S. at 338. "Standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim

he seeks to press and for each form of relief that is sought." Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008) (citation modified).

The third element, redressability, requires a plaintiff to show "that a favorable resolution of her claim would likely redress the professed injury." Katz v. Pershing, LLC, 672 F.3d 64, 72 (1st Cir. 2012). "To determine whether an injury is redressable," courts "consider the relationship between the judicial relief requested and the injury suffered." Murthy, 603 U.S. at 73 (citation modified). Redress needs to be "likely," though it need not be complete. See Lujan, 504 U.S. at 560–61; Uzuegbunam v. Preczewski, 592 U.S. 279, 291 (2021); see also Katz, 672 F.3d at 72 ("Redressability is a matter of degree. To satisfy this requirement, the plaintiff need not definitively demonstrate that a victory would completely remedy the harm." (citation modified)). "The primary goals of [the redressability] requirement are to ensure that plaintiffs do not sue the wrong parties and that courts do not issue advisory opinions." Diamond Alt. Energy, LLC v. Env't Prot. Agency, 606 U.S. 100, 120 (2025). "It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability." Haaland v. Brackeen, 599 U.S. 255, 294 (2023).

The United States seeks injunctive relief, declaratory relief, and costs and fees. The Court assesses whether the claim for injunctive relief establishes standing. See California v. Texas, 593 U.S. 659, 672–73 (2021); Lewis v. Cont'l Bank Corp., 494 U.S. 472, 480 (1990).

1. *Detainer Provisions*

The Court first considers the United States' standing to seek an injunction barring enforcement of the Boston Trust Act's prohibition on Boston law enforcement officers detaining individuals solely based on federal civil immigration detainers or administrative warrants. Doc. No. 1 ¶ 6; Bos., Mass., Mun. Code ch. 11, § 1.9(B), (D)(1)(a). The United States alleges two injuries: (1) injuries "related to its obligation to enforce immigration laws"—in particular,

"increased operational costs to enforce federal immigration law"; and (2) a "sovereign harm" that "can substitute as a traditional injury in fact for purposes of standing." Doc. No. 61 at 3–5 (citing Doc. No. 1 ¶¶ 6, 23–24, 38–40, 44); Doc. No. 66 at 3–4 (citing Doc. No. 1 ¶¶ 38–40, 47). Because the United States has made no plausible showing that the Court's judgment could redress these asserted injuries, the United States lacks standing to pursue this claim for relief.

The redressability problem here is as straightforward as it is fatal to the United States' claim. As a matter of Massachusetts law, Boston law enforcement officers may not detain a person solely based on a federal civil immigration detainer or administrative warrant because no authority empowers them to do so. See Lunn, 78 N.E.3d at 1160. With or without the Boston Trust Act, then, Boston police officers cannot detain a person pursuant solely to a federal civil immigration detainer or administrative warrant.[8] The relief the United States seeks—an order enjoining the City of Boston from enforcing the Trust Act's prohibition on detaining noncitizens solely pursuant to a civil immigration detainer or administrative warrant—could not alter this status quo. Because the Court's judgment cannot alleviate the United States' "operational" injury, even in part, the United States has not plausibly shown redressability.[9]

---

[8] The challenged provisions of the Boston Trust Act prohibit Boston law enforcement officers and other city employees from "[d]etaining an individual solely on the basis of a civil immigration detainer request" and "[m]aking arrests based solely on ICE administrative warrants including administrative warrants after the individual is eligible for release from custody." Bos., Mass., Mun. Code ch. 11, § 1.9(B), (D)(1)(a). As the defendants and the Commonwealth of Massachusetts as amicus curiae aptly put it, these provisions merely provide that Boston police "do not take actions that state law forbids." Doc. No. 44 at 18; accord Doc. No. 16 at 3–4.

[9] The United States did not address Lunn in its complaint or in its opposition to the City's motion to dismiss (despite the City's discussion of Lunn in its briefing, Doc. No. 16 at 3–4). The Court ordered the parties to submit supplemental briefing regarding Article III standing and specifically directed them to address the Supreme Judicial Court's holding in Lunn (as well as the Trust Act's savings clause, discussed below). Doc. No. 59. In its supplemental briefing regarding standing, the United States argues that "Lunn has nothing to do with this case" because (1) the Boston Trust Act was initially enacted before Lunn was decided, (2) the ordinance does not specifically refer to Lunn, and (3) the Boston Police Commissioner's annual (Boston Trust Act–

It is true, as the United States argues, that redress need not be "complete" to support Article III standing. Doc. No. 61 at 9–10; see also, e.g., Uzuegbunam, 592 U.S. at 291; Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 317–19 (1st Cir. 2012). But the United States as plaintiff "must show that the [C]ourt can fashion a remedy that will at least lessen its injury." Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc., 958 F.3d 38, 49 (1st Cir. 2020); see also, e.g., Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec., 909 F.3d 446, 465 (D.C. Cir. 2018) (plaintiff lacked standing to challenge agency directive where statute "prohibits all the same conduct" and "invalidation of the [d]irective alone would do nothing to help [plaintiff's] plight as long as [the statute] remains good law"); cf. Uzuegbunam, 592 U.S. at 291 (noting that although nominal damages "often cannot provide full redress," they are nevertheless "damages paid to the plaintiff" that "affect the behavior of the defendant towards the plaintiff" and "thus independently provide" at least partial redress (citation modified)); Antilles Cement Corp., 670 F.3d at 317–19 (plaintiff had standing to challenge two laws despite not challenging third, overlapping law because challenged laws "place[d] more onerous burdens on" plaintiff than unchallenged law did, so plaintiff's injury "would at least be alleviated" by requested relief). Here, a court order enjoining enforcement of the Boston Trust Act could not lessen or alleviate

required) reports state that detainer requests were "[not] acted upon per the Boston Trust Ordinance" without referring to Lunn. Doc. No. 61 at 9 (citing Doc. Nos. 1-2, 1-7). This argument is well wide of the mark. Lunn held that state law prohibits law enforcement officers from detaining persons solely on the authority of a civil immigration detainer after the expiration of the state-law basis for their custody. Put differently, Lunn's holding means that Boston police officers *lack authority* to do what the United States would like them to (at least) have the option to do—hold noncitizens beyond the time they are entitled to release so that ICE can take custody of them. Lunn's holding is, plainly, central to answering the question whether a federal court could redress the United States' alleged injuries. Whether the Trust Act (or reports filed pursuant to it) cite Lunn is immaterial. And though decided after the Boston Trust Act was first enacted, Lunn did not cite, construe, or depend on the Trust Act; instead, it turned on existing state statutory and common law.

the United States' injury. The moral victory of a favorable federal-court opinion (but see infra note 10) is inadequate (and irrelevant); it is a court's judgment, not its opinion, that provides redress. Brackeen, 599 U.S. at 294. To conclude otherwise would be to render an impermissible advisory opinion. See Diamond Alt. Energy, 606 U.S. at 120.

To illustrate why redressability is absent here, consider another lawsuit in which the United States established its standing to challenge policies similar to the Boston Trust Act (though its claims were dismissed on the merits[10]). The United States sued Illinois, Cook County, and the City of Chicago, seeking an injunction against enforcement of state and local laws that prohibit government officials from, among other things, honoring ICE detainers. Illinois, 796 F. Supp. 3d at 506, 508–11. The district court concluded that enjoining the challenged state and local laws would render state and local law enforcement "free to cooperate with federal immigration authorities" and would "remove definitive impediments to federal immigration policy." Id. at 510. Although such an injunction "would not guarantee state and local cooperation," it would "provid[e] state and local officials the option" to cooperate and would, thereby, "at least partially redress" the alleged injuries. Id. at 510 n.8. The United States thus established redressability (along with the other Article III requirements).

Here, by contrast, the injunctive relief the United States seeks would not render Boston law enforcement officers "free to cooperate" with ICE detainers and administrative warrants, nor

[10] The present case is one of nearly a dozen suits the United States brought in 2025 against cities and states with so-called "sanctuary" policies. So far, four suits have reached final judgment—all dismissing the United States' claims in their entirety. Illinois, 796 F. Supp. 3d 494; United States v. New York, 810 F. Supp. 3d 329 (N.D.N.Y. 2025); United States v. New York, 814 F. Supp. 3d 266 (N.D.N.Y. 2025); United States v. Colorado, No. 25-CV-01391-GPG-KAS, 2026 WL 878882 (D. Colo. Mar. 31, 2026). The United States' briefing in this case largely ignored those thoughtful, persuasive opinions and did not attempt to explain why this Court should reach a different conclusion on the merits (if it reached the merits).

"provid[e] . . . local officials the option" to honor ICE's requests. Id. at 510 & n.8. Boston police officers' authority to conduct arrests derives from, and is delimited by, state law. Lunn, 78 N.E.3d at 1154. In Massachusetts, there is simply no source of authority empowering Boston police officers to do what the United States would like them to do.[11] An order enjoining the Boston Trust Act would not liberate the City to empower its officers to take actions state law does not authorize, nor give Boston police officers the individual choice to honor ICE detainers.

Other governmental actors could conceivably give the United States the relief it seeks. The Massachusetts Supreme Judicial Court (but not this Court) could conclude Lunn was wrongly decided as a matter of state law. Or the Massachusetts legislature (but not this Court) could enact a statute authorizing Massachusetts law enforcement officers to arrest people pursuant to federal civil immigration detainers. See Lunn, 78 N.E.3d at 1156–58 & n.25. Or Congress (but not this Court) could enact federal legislation granting local law enforcement officers this authority.[12] See id. at 1154, 1159–60. But this Court's order enjoining enforcement of the Boston Trust Act decidedly would not alleviate the United States' injury. Cf. Murthy, 603 U.S. at 57–58, 74 (identifying "bedrock principle" that "a federal court cannot redress injury that results from the independent action of some third party not before the court"). The United States therefore cannot satisfy redressability as to its "operational" injury.

The United States also claims, somewhat opaquely, that the Boston Trust Act's detention-related provisions cause it "sovereign harm" that would be redressed by an injunction. Doc. No. 61 at 3, 7. To the extent this injury relates to the frustration of, or withdrawal of support for,

---

[11] The United States concedes it does not seek a positive injunction compelling Boston police officers to conduct arrests and detentions they lack authority to conduct as a matter of state law. Doc. No. 70 at 51–52.

[12] The Court expresses no opinion about the constitutionality or wisdom of these hypothetical enactments.

federal civil immigration enforcement operations, see Doc. No. 66 at 2–4; see also Illinois, 796 F. Supp. 3d at 509; United States v. Missouri, 114 F.4th 980, 984 (8th Cir. 2024), the foregoing discussion encompasses this injury. But elsewhere, the federal government contends it suffers a "sovereign harm" from the existence of an allegedly preempted local ordinance (separate from any concrete harm from the ordinance's enforcement), and that this harm "can substitute as a traditional injury in fact." Doc. No. 61 at 3–4. In explicating its position at oral argument, the United States asserted this theory would apply equally to a nonbinding city-council resolution (e.g., one expressing the City's view that ICE should not deport people) as to an enactment with the force of law. Doc. No. 70 at 48–50. In other words, the United States argues its sovereignty is injured by—and it can therefore file suit in federal court to challenge and enjoin—not only any local or state enactment arguably preempted by federal statute but any pronouncement of a position contrary to federal policy.

The implications of this argument are sweeping. See United States v. California, No. 2:25-cv-06230-MCS, 2026 WL 784514, at *4–5 (C.D. Cal. Mar. 18, 2026) (noting theory that "mere existence of a preempted state law creates a sovereign injury to the federal government" is not supported by binding authority and has potentially sweeping consequences (emphasis in original)); cf. California, 593 U.S. at 670–71 ("The party who invokes the power [of Article III courts] must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement." (alteration in original) (quoting Massachusetts v. Mellon, 262 U.S. 447, 488 (1923))). It suggests that any official statement opposing federal policies or positions suffices to provide the United States standing to seek an injunction, even if the statement lacks any practical effect. The United States cites no on-point authority for this essentially limitless view of sovereign injury.

Regardless, the United States has failed to show such an injury would be redressed, in part or in whole, by the injunction it seeks here. The Court has already explained why an injunction could not redress the United States' concrete injuries stemming from the Trust Act's enforcement, either under the "operational" theory or the "frustration" theory. That leaves the United States' challenge to the Trust Act's existence—in essence, its request for a declaratory judgment of the Act's invalidity. "In these circumstances, injunctive relief could amount to no more than a declaration that the statutory provision [the plaintiff] attack[s] is unconstitutional, i.e., a declaratory judgment." California, 593 U.S. at 673. But "that is the very kind of relief that cannot alone supply jurisdiction otherwise absent." Id.; see also id. at 670–73 (cautioning that finding standing without "possibility of any judicial relief" would allow a federal court to issue an impermissible advisory opinion (quoting Los Angeles v. Lyons, 461 U.S. 95, 129 (1983) (Marshall, J., dissenting))); All. for Hippocratic Med., 602 U.S. at 378–79 ("[F]ederal courts do not issue advisory opinions about the law—even when requested by the President.").

Finally, at oral argument, the United States advanced arguments it had not made in the complaint, original motion-to-dismiss briefing, or supplemental briefing regarding standing. The United States was unable to explain, to any satisfactory degree, why the arguments it advanced in the hearing differed from its earlier litigation positions or why the briefing omitted its new arguments, nor did it ask to amend its pleadings. See, e.g., Doc. No. 70 at 29–30, 39–42.

Those unbriefed arguments are waived.[13] See, e.g., Stanley v. Am. Econ. Ins. Co., No. 24-cv-10622-DJC, 2026 WL 194632, at *6 (D. Mass. Jan. 26, 2026) ("[T]he First Circuit has

---

[13] In any event, these belated arguments would not alter the Court's conclusions regarding standing. The United States argued that, because the Lunn court did not decide "whether the detention of an individual pursuant to a [f]ederal civil immigration detainer by a Massachusetts officer who is operating under [a 287(g) agreement] would be lawful," Lunn, 78 N.E.3d at 1158 n.26, the relief sought in this case could at least partially redress the United States' injuries. Doc.

'consistently held . . . except in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived.'" (quoting United States v. Pizarro-Berríos, 448 F.3d 1, 5 (1st Cir. 2006))); Peter Pan Bus Lines, Inc. v. Greyhound Lines, Inc., 189 F. Supp. 3d 217, 225 (D. Mass. 2016) (collecting cases).[14]

---

No. 70 at 52–57. The logic goes like this: Suppose the Court enjoined enforcement of the Boston Trust Act as the United States seeks. Then, at some future point, perhaps the City might change tack and decide to enter into a voluntary 287(g) agreement with DHS whereby Boston police officers could hold noncitizens pursuant to federal civil immigration detainers (assuming Boston police officers would have authority to make such arrests under a 287(g) agreement in the absence of a state statute granting that authority, but cf. 8 U.S.C. § 1357(g)(1) (stating agreements may be made "to the extent consistent with State and local law")). Such an attenuated logical chain is not the stuff of which Article III standing is made—particularly in the absence of any factual allegations, or reasonable inferences therefrom, that the City is likely to, or has demonstrated a scintilla of interest in, entering a 287(g) agreement. The complaint's factual allegations do not plausibly permit such an inference. See Doc. No. 1 ¶¶ 2, 6, 37.

[14] One of the new and waived arguments warrants additional comment. At oral argument, the United States asserted that DHS regulations impose a mandate on local and state law enforcement agencies to detain noncitizens for up to forty-eight hours when an ICE detainer issues. Doc. No. 70 at 32, 34–35, 39–42; 8 C.F.R. § 287.7(d). This position is an about-face from the United States' position in its briefing, which explained that "[a] detainer might also ask the City to retain custody over the alien for a brief period, thereby ensuring a safe transfer into federal custody," Doc. No. 53 at 11 (emphasis added) (citing 8 C.F.R. § 287.7(d)), and reiterated, "the Federal Government . . . does not expect Boston police to arrest particular aliens or extend the custody of those who would otherwise be released," id. at 16. This is not a minor detail—on the federal government's briefing, the City's noncooperation frustrates and undermines a voluntary, collaborative process; on its oral-argument position, the City defies a federal mandate each time it does not hold a noncitizen at ICE's request. The United States did not acknowledge that its oral-argument position materially departed from its briefing position, nor did it offer a reasoned explanation for the shift. Doc. No. 70 at 32–33, 41–42.

The United States' newly announced position is rooted in the regulation's use of the word "shall." 8 C.F.R. § 287.7(d). Of course, the word "shall" might suggest a command, especially if one looked no further than that isolated term. But, as the Supreme Court has explained, the proper interpretation of statutory or regulatory text requires reading and interpreting the text's words "in their context, not in isolation." Sw. Airlines Co. v. Saxon, 596 U.S. 450, 455 (2022) (citation modified). Doing so reveals numerous persuasive authorities, including DHS's own regulations and guidance, that undermine the federal government's newfound position.

For starters, the regulation itself defines a detainer as "a request." 8 C.F.R. § 287.7(a). A request is "the act or instance of asking for something" or "something asked for." Request, Merriam-Webster's Collegiate Dictionary 1058 (11th ed. 2003). On DHS's detainer forms sent to local and state authorities, see 8 C.F.R. § 287.7(a), DHS describes the forty-eight-hour hold as both a "request" and a ceiling on the amount of time an agency may hold a person pursuant to a

Because a favorable judgment from this Court could not provide any relief to the United States, the United States has failed to satisfy the "redressability" prong of Article III standing with respect to the Boston Trust Act's detention and arrest provisions.

2. *Information-Sharing Provisions*

The United States also lacks standing to challenge the information-sharing provisions of the Boston Trust Act because its alleged injuries are neither traceable to the Boston Trust Act nor redressable by the judicial relief it seeks. See All. for Hippocratic Med., 602 U.S. at 380 ("The second and third standing requirements—causation and redressability—are often flip sides of the same coin." (citation modified)).

---

detainer. See Dep't of Homeland Sec., Form I-274A, Immigration Detainer—Notice of Action (2017) ("**IT IS THEREFORE REQUESTED THAT YOU** . . . **[m]aintain custody** of the alien for a period **NOT TO EXCEED 48 HOURS** beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody." (emphasis in original)). ICE's public website states, "Immigration detainers are only requests. They don't impose any obligations on law enforcement agencies." Immigration Detainers, U.S. Immigr. & Customs Enf't, https://www.ice.gov/immigration-detainers [https://perma.cc/FX5P-GR7Z] (last visited May 14, 2026) (emphasis added) ("An immigration detainer is a request from ICE that asks a federal, state or local law enforcement agency . . . [to] [h]old the alien for up to 48 hours beyond the time they would ordinarily release them so DHS has time to assume custody . . . ." (emphasis omitted)).

The First Circuit has described detainers as requests. Morales, 793 F.3d at 212 ("[A]n immigration detainer . . . is a request from ICE to another law enforcement agency to detain a non-citizen up to 48 hours so that ICE may investigate whether the non-citizen is subject to deportation." (citing 8 C.F.R. § 287.7(a), (d))). The Third Circuit has thoroughly rejected the position that § 287.7(d) mandates that agencies hold the subjects of immigration detainers. Galarza, 745 F.3d at 639–42. No federal statute authorizes DHS to impose such a mandate. Id. at 640 ("[N]o provisions of the [INA] authorize federal officials to command local or state officials to detain suspected aliens subject to removal."); accord Lunn, 78 N.E.3d at 1152. Indeed, the United States as amicus curiae in Lunn conceded that § 287.7(d) "defines the maximum length of time that an alien with an immigration detainer may be held. It does not require local law enforcement agencies to hold anyone." Lunn, 78 N.E.3d at 1152 & n.18 (emphasis added).

The United States failed to grapple with any of the foregoing contrary authority (not to mention its own briefing position in this case) when it asserted for the first time at oral argument that § 287.7(d) holds are mandatory. That is not to say parties' positions cannot evolve or be refined over the course of litigation when there is a good-faith, reasoned explanation for such clarification. That was not the case here.

Federal law prohibits local governments (among others) from restricting their agencies and employees from sending DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); see also id. § 1373(b) (similar); id. § 1644 (similar as to "information regarding the immigration status, lawful or unlawful, of an alien in the United States"). The Trust Act bars Boston law enforcement officers and other employees from providing ICE with individuals' "personal information" and information "regarding a person's release date or time."[15] Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a)(3). It defines "personal information" as information that "identifies or describes an individual, that can be used, either alone or in combination with other information, to identify individual subjects, such as his or her name, Social Security number, physical description, home address and/or work address." Id. § 1.9(A). Finally, it provides: "This [Act] does not prohibit or restrict any government Agency from complying with 8 U.S.C. §§ 1373 and 1644." Id. § 1.9(D)(3).

The United States seeks a judgment "declaring that the Boston Trust Act violates 8 U.S.C. § 1373 and is therefore invalid" and an injunction prohibiting the City "from enforcing the Boston Trust Act." Doc. No. 1 at 16. As reiterated at oral argument, the United States asserts a facial challenge to the Boston Trust Act. See, e.g., Doc. No. 1 ¶ 43; Doc. No. 70 at 57, 80. It does not argue, nor does it make any factual allegations suggesting, that the City or its officers enforce the Boston Trust Act in a manner that deviates from the Trust Act's plain text.

The United States alleges it is injured because enforcement of the Boston Trust Act violates § 1373 and that an injunction would redress its injury by "prevent[ing] future violations

[15] The Trust Act also bars providing this information to ICE-HSI "solely for the purpose of enforcing civil violations of United States immigration laws." Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a)(4).

of federal law."[16] Doc. No. 61 at 10. But the Boston Trust Act, on its own terms, does not prohibit the sharing of information "regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). The information whose sharing the Trust Act restricts (namely, release date and time and limited personally identifying information) falls squarely outside the ambit of § 1373, and the United States' implausible argument to the contrary has been roundly rejected by other federal courts. See Illinois, 796 F. Supp. 3d at 516–19 (collecting cases). In case there was any ambiguity (and there is not), the Trust Act expressly provides that none of its provisions preclude compliance with 8 U.S.C. §§ 1373 and 1644.[17]

In short, there is a fatal disconnect between the injury the United States alleges and the judicial relief it seeks. See Murthy, 603 U.S. at 73. Any injury the United States has suffered from alleged violations of § 1373 is not traceable to the Boston Trust Act's challenged provisions, which are facially consistent with § 1373. A court order enjoining enforcement of the Boston Trust Act would not redress the United States' § 1373–based claims of injury, just as an order requiring Boston to comply with § 1373 would be redundant with the ordinance's existing provisions and provide no incremental relief. Accordingly, the United States lacks Article III standing with respect to the Boston Trust Act's information-sharing provisions.[18]

---

[16] The complaint focuses primarily on § 1373, and no party suggests there is a material difference, for present purposes, between the scope of § 1373 and § 1644. In any event, the Boston Trust Act is facially consistent with both §§ 1373 and 1644.

[17] This is not a case in which a law "unambiguously commands action" contrary to its purported "savings clause," City & County of San Franscisco v. Trump, 897 F.3d 1225, 1239–40 (9th Cir. 2018), nor where the law would "destroy itself" through its savings clause, League of United Latin Am. Citizens v. Exec. Off. of the Pres., 780 F. Supp. 3d 135, 175 (D.D.C. 2025) (quoting Tex. & Pac. Ry. Co. v. Abilene Cotton Co., 204 U.S. 426, 446 (1907)). The savings clause in the Boston Trust Act merely confirms what the plain text of the ordinance states: the Act's restrictions on information sharing do not reach the information covered by §§ 1373 and 1644.

[18] Even if this fundamental defect in the United States' challenge is considered through a merits lens rather than as a question of standing—and whether the United States' position is that § 1373 reaches "predicate facts necessary to determine one's citizenship or immigration status," as

A dismissal for lack of Article III standing is without prejudice. Hochendoner v. Genzyme Corp., 823 F.3d 724, 736 (1st Cir. 2016). The Court notes, however, that the United States has never sought leave to amend its complaint or suggested that it would seek such leave were the Court to grant the motion to dismiss. Indeed, the Court and parties discussed this issue during oral argument, and the United States still did not say or suggest that it would seek leave to amend if its complaint were dismissed. Doc. No. 70 at 11–17. As the foregoing illustrates, the United States is unlikely to cure the jurisdictional defects that led to this dismissal.

---

stated in its briefing, Doc. No. 53 at 14, or that it reaches all information "pertinent to immigration status" as stated at oral argument, Doc. No. 70 at 63—the conclusion is the same. Federal law prohibits the restriction of sharing a limited, straightforward category: information "regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); see also, e.g., California, 921 F.3d at 891–92 ("[T]he phrase 'information regarding the citizenship or immigration status, lawful or unlawful, of any individual' is naturally understood as a reference to a person's legal classification under federal law . . . ."). The information whose sharing Boston restricts—personally identifying information and information about a person's release date and time—is beyond the scope of § 1373. See Steinle v. City & County of San Franscisco, 919 F.3d 1154, 1164 (9th Cir. 2019) ("The statutory text at issue clearly does not include release-date information."); Illinois, 796 F. Supp. 3d at 516–19 (persuasively explaining that "text, structure, and history of § 1373" support conclusion that statute "only pertains to information regarding a person's legal classification under federal law" and noting that "[t]his issue has been treated extensively by other courts," which have "each rejected the United States'[] capacious reading of § 1373"); see also California, 921 F.3d at 891–92 (noting that while terms like "'regarding' may generally have 'a broadening effect,'" if "the term 'regarding' were 'taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for "[r]eally, universally, relations stop nowhere"'" (first quoting Lamar, Archer & Cofrin, LLP v. Appling, 584 U.S. 709, 717 (2018); and then quoting N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995))); United States v. New York, 814 F. Supp. 3d 266, 277 (N.D.N.Y. 2025) (noting United States' position has been rejected by other courts to confront issue and finding it "unnecessary to spill further judicial ink" to reach same conclusion).

IV. CONCLUSION

For the foregoing reasons, the motion to dismiss is ALLOWED. All claims against Mayor Michelle Wu, Commissioner Michael Cox, and the Boston Police Department are DISMISSED. All claims against the City of Boston are DISMISSED WITHOUT PREJUDICE.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**The United States of America**

Plaintiff,

CIVIL ACTION NO. 1:25-12456-LTS

V.

**City of Boston et al.,**

Defendants.

## ORDER OF DISMISSAL

Sorokin, D. J.

In accordance with the Court's ORDER ON MOTION TO DISMISS, Dkt. No. 72, dated May 28, 2026, it is hereby ORDERED that the above-entitled action be and hereby is DISMISSED.

By the Court,

5/28/2026
Date

/s/ Flaviana de Oliveira
Deputy Clerk